𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

## VAUGHAN V. LYTTON.

January 22, 1920.

1. LARCENY—*Definition.*—Simple larceny is defined to be: "The *wrongful or fraudulent taking of personal goods* of some *intrinsic value,* belonging to *another,* without his *assent,* and with the intention to *deprive* the owner thereof *permanently.*"

2. LARCENY—*Animus Furandi.*—The *animus furandi* must accompany the taking, but in cases of common law larceny, as distinguished from cases of embezzlement and obtaining property by false pretense, the wrongful taking of the property in question, under the circumstances indicated in the definition given in the preceding syllabus, necessarily and in itself imports the *animus furandi;* and it would be a contradiction to instruct the jury that such a taking would not be larceny if the accused did not intend to steal. That kind of taking is stealing *per se.*

3. LARCENY—*Intent—Claim of Right.*—If goods alleged to have been the subject of larceny were taken under a *bona fide* claim of right, there is no larceny, but there must be a claim of right and title to the particular goods themselves, and not some imaginary idea on the part of the taker that he can do what the law says is larceny without committing a crime.

4. LIBEL AND SLANDER—*Justification—Question for Jury.*—In an action for libel brought by the former president of a corporation against its secretary and treasurer, who had written a customer of the corporation that it had become necessary for the president "to close his relations with this company on account of *misappropriating* funds of this company, in taking checks from the mails and using personally," there was sufficient evidence to make it proper for the trial court to submit to the jury the question whether the president did in fact take the check under conditions which rendered him guilty of larceny.

5. LIBEL AND SLANDER—*Privileged Communications—Case at Bar.*—In an action for libel brought by the former president of a corporation against its secretary and treasurer, who had written a customer of the corporation that it had become necessary

for the president "to close his relations with this company on account of *misappropriating* funds of this company, in taking checks from, the mails and using personally," the occasion was held privileged where defendant supposed the interests of the company were jeopardized by plaintiff representing himself to the customer as still connected with the company.

6. LIBEL AND SLANDER—*Privileged Communications—Abuse of Privilege—Case at Bar.*—Notwithstanding that the occasion was privileged, there was evidence upon which the jury might properly have found that the privilege was abused. The language itself, italicized by the defendant, taken in connection with the previous correspondence and dispute between the parties, would warrant the court in upholding the action of the jury upon the question of malice.

7. LIBEL AND SLANDER—*Privileged Communications—Abuse of Privilege—Question for Jury.*—Where there is room to doubt whether the language used is out of proportion to the occasion, or where there is extrinsic evidence of malice such as a previous grudge or quarrel, the jury must be permitted to pass on the question of abuse of privilege.

8. LIBEL AND SLANDER—*Justification—Instructions.*—In an action for libel defendant requested the court to instruct the jury that if they believe from the evidence that the alleged libelous statements contained in the letter from defendant were substantially true, they must find for the defendant. The court refused to give this instruction as offered, but amended the same by inserting after the words "substantially true" the words "in the ordinary and usually accepted meaning thereof." The court had already given at the request of the defendant an instruction telling the jury that they were to deal with the words in question in "their usual meaning and ordinary signification."

*Held:* That if there was error in the amendment to the instruction, which the court did not think, defendant could not be heard to complain of it.

9. LIBEL AND SLANDER—*Instructions—Modification.*—In an action for libel defendant requested the court to instruct the jury, "that an officer and stockholder of a corporation has no right to withdraw from the mail and personally indorse a check, drawn by a debtor of and payable to the corporation, and use, hold, or apply the proceeds of said check to the payment of a disputed claim which the officer and stockholder holds or makes against the corporation, without express authority from the corporation or its board of directors, *and such action, if without authority, is a misappropriation of the funds of the cor-*

*poration,* *whether* *done* *with* *evil* *intent* *or* *not.*" The court
refused to give the instruction as offered, and amended it by
striking out the words italicized.

*Held:* No error.

10.  LIBEL AND SLANDER—*Privileged Communications—Conflicting In-
structions.*—In an action for libel the court on behalf of plain-
tiff instructed the jury that even though defendant's communi-
cation was written and published in good faith, still it was not.
privileged, if it went beyond the occasion or exigency and was
unnecessarily defamatory of the plaintiff.

*Held:* That the instruction was not erroneous as being in con-
flict with another instruction that the letter was privileged.

Error to a judgment of the Corporation Court of city of
Danville, in an action of trespass on the case. Judgment
for plaintiff. Defendant assigns error.

*Affirmed.*

The opinion states the case.

*Buford & Peterson,* for the plaintiff in error.

*Eugene Withers* and *Nathaniel T. Green,* for the defend-
ant in error.

KELLY, P., delivered the opinion of the court.

This is an action for defamation of character brought by
J. W. Lytton against C. C. Vaughan, Jr. There was a ver-
dict in Lytton's favor for $3,500.00, upon which the court
entered the judgment under review.

In the fall of 1908, Lytton, Vaughan and one Morel,
entered into an agreement looking to the incorporation and
organization of the "Lytton Manufacturing Corporation,"
for the purpose of manufacturing and selling certain steam-
traps, vacuum-traps and return-traps which had been pa-
tented by Lytton. The agreement provided, among other
things, that Lytton should be the president of the company,

Morel the vice-president, and Vaughan the secretary and treasurer; that Vaughan should have one-third of the capital stock and should discount the company's notes to the extent of $5,000.00 upon the endorsement of all three of the parties, and should procure such additional and necessary financial aid for the company as its success might justify; that Lytton and Morel should have the remaining two-thirds of the stock to be divided between them in such proportion as they should agree upon; that Lytton should transfer and assign to the company all of his interest in the traps referred to in the agreement, together with any improvements which he might invent, and that he should be paid in cash the actual cost to him of all patents as well as any traps and patterns and material which he then had on hand.

Pursuant to this agreement the corporation was duly organized, the officers elected, the transfers of stock and material, letters patent, patterns, etc., made, and Lytton was paid $300.00 in cash, which Vaughan claims was in full payment of every money claim Lytton could have properly asserted against the company, but which Lytton claims was $230.00 less than he should have received under the terms of the contract.

About eighteen months after the incorporation and organization of the company Lytton made his first claim for this amount, and explains now that his reason for not doing so earlier was that the company needed the money, that he himself had become indebted to Vaughan, and that he did not feel disposed to press the claim. He seems to have made no further demand until some years later when on May 23, 1916, he wrote Vaughan requesting a check for $230.00. To this letter Vaughan replied two days later expressing great surprise at the claim, denying its correctness *in toto*, and undertaking to demonstrate that it could not be correct. On May 26, 1916, Lytton wrote Vaughan

at length, giving him detailed statements and insisting upon the correctness of his demand. Other correspondence followed, from which it appears that friction had arisen with reference to the management of the corporation. Finally on September 9, 1916, Lytton wrote Vaughan a letter enclosing a notice of a stockholders' meeting, declaring his intention of seeing if there could not be some change in the management of the corporation, at the same time indicating a willingness to make some friendly agreement as to the conduct of the business. In this letter Lytton enclosed various checks of customers of the corporation, and added: "I have also withdrawn a check payable to the company for an amount in excess of what the company is due me for patterns and have cashed the same and will apply the proceeds thereof so far as necessary to payment of such amount, and interest due thereon. There will be a balance after the payment of my debt, which I will promptly turn over to you as soon as I can hear from the check, giving you at the same time a statement as to the amount of the check, etc."

It is conceded that Lytton, although president of the company, had no authority to cash the checks or to handle the funds of the corporation. This was exclusively within the authority of the secretary and treasurer, Vaughan, who at this time was carrying a heavy indebtedness for the company, was very much displeased with the action which Lytton had taken in collecting the check and placing it to his own credit, and he at once wrote Lytton a letter in which he charged him with having violated the statute of Virginia against embezzlement, and threatened him with immediate prosecution if he did not pay to him as treasurer the full face value of the check before three o'clock the next day. To this letter Lytton replied that he had not violated the law; that he had consulted counsel and felt that he had a right to do what he had done. No prosecu-

tion was instituted against Lytton, but the incident, along with other unpleasantness between the parties, resulted in Lytton's retirement and a settlement between him and Vaughan, pursuant to which Lytton sold to Vaughan all of his interest in the company and released all claims against it. As a consideration for this transfer, Vaughan agreed to release Lytton from and indemnify him against all liability as endorser upon obligations of the company amounting to about $45,000.00, and to pay him the sum of $1,000.00. This sum was paid by cancelling a small note which he owed Vaughan, and a small coal bill due from him to the company, allowing him the amount of the company's check which he had cashed, and giving him Vaughan's check for the balance. The $230.00 theretofore claimed by Lytton does not specifically appear in the settlement, but was of course covered by his release of all claims against the company. This settlement was arrived at within less than a month after the abstraction of the check. In the meantime, the money which Lytton had collected on the check in question had remained on deposit in his bank to await a final determination as to his right to use it. This fact is established by the testimony of Lytton himself and by the cashier of the bank where the money was on deposit, and is an important circumstance in this case. It is true that Vaughan perhaps did not know this, but after writing the letter in which he threatened Lytton with criminal prosecution, he made no further inquiry about it and no further demand for an accounting, but proceeded to apply for and secure a receivership for the company in a suit to which Lytton was a party, and in which it is reasonable to assume both parties expected this matter would be settled, and pending which it was in fact settled. Lytton had no legal right to take the check. Having done so, his course would have been less censurable if he had informed Vaughan that he did not intend to use the money until his

right to do so had been settled. But, as we view the case, Lytton's conduct was not such as to enable us to say that he was guilty of any criminal intent.

After Lytton severed his connection with this corporation, he went into a similar enterprise in Norfolk, and in April, 1917, sold some traps to the Riverside and Dan River Cotton Mills at Danville, one W. F. Cox acting for the cotton mills in the transaction, and Lytton explaining to Cox that he was no longer connected with the former company. Lytton sent a man named Hurst to Danville to install the traps for the cotton mills, and while there Cox called his attention to a trap which had not been giving satisfactory results, but which had been purchased from the former Lytton company. Hurst suggested that this particular trap be sent back for repair to the company from which it was purchased, and this was done. The cotton mills by letter notified that company that the trap was being returned for repair, and the language of the letter indicated that the writer thought the trap had been returned at the direction of a representative of that company. This letter called forth the following reply from the Lytton Manufacturing Corporation which was written by C. C. Vaughan, Jr., the defendant in this action, to-wit:

"Gentlemen:

"We are in receipt of your letter of the 18th instant, enclosing B/L covering shipment of a pumping trap, which you state was sent in accordance with instructions from our representative, and that you presumed he had written us concerning it, as it was in connection with the present work now going forward at the Riverside division.

"We are at a loss to understand this representation as we have had no representative at your plant and do not know anything of the work referred to at your Riverside division.

"Last October it became necessary for Mr. Lytton to

close his relations with this company on account of *misappropriating* funds of this company, in taking checks from the mails and using personally, and as he is now manufacturing traps in Norfolk, which we are told is an infringement upon patents held by this company, it is possible he has entered into transactions with your company representing that he was still connected with this company. If such is the case we beg to advise that it is a misrepresentation, as he is not associated in any capacity with this company."

Thereupon Lytton brought this suit charging that Vaughan had falsely and maliciously charged him with theft and embezzlement. The case at the trial turned exclusively, as it does here, upon the following language in the letter: "Last October it became necessary for Mr. Lytton to close his relations with this company on account of *misappropriating* funds of this company in taking checks from the mails and using personally." (Italics in the original.)

The defendant pleaded the general issue and justification, and upon the issues thus presented the jury rendered the verdict and the trial court entered the judgment as above set out.

The important and decisive questions in the case arise under the assignment of error based upon the refusal of the court to set aside the verdict as contrary to the law and to the evidence. Under this head it is insisted, in the first place, that the court ought to have held that the plea of justification was sustained as a matter of law, or, in other words, that the language from the letter last above quoted, and which constitutes the whole foundation for the case, was conclusively shown to be true.

The question thus presented is full of interest and is not entirely free from difficulty. Under section 3708 of the Code a bank check is made the subject of common law

larceny. The gravamen of the declaration is that the word "misappropriating" implied some criminality on the part of Lytton. This charge is squarely and frankly met by the defendant Vaughan, who contended in the lower court and contends here that Lytton was guilty of larceny.

[1] Simple larceny, as defined by Mr. Minor in his Synopsis of Criminal Law, page 98, is: "the *wrongful or fraudulent taking of personal goods* of some *intrinsic value,* belonging to *another,* without his *assent,* and with the intention to *deprive* the owner thereof *permanently."* (Italics in the text.)

As defined by Mr. Wharton in the second volume of his work on Criminal Law at section 1095, larceny is "the fraudulent taking and carrying away of a thing, without claim of right, with the intention of converting it to a use other than that of the owner, without his consent."

The offense is defined in 2 Bishop on Criminal Law, section 758, as "the taking and removing by trespass of personal property which the trespasser knows to belong either generally or specially to another with the intent to deprive such owner of his ownership therein; and, perhaps it should be added, for the sake of some advantage to the trespasser —a proposition on which the decisions are not harmonicus."

With reference to the last proposition, namely, that in order to constitute larceny the act must have been done *lucri causa,* the authorities are in conflict, but it is immaterial here because Lytton took the check for his own personal benefit, and if the taking *lucri causa* is essential to the offense in this State, the element was present in this case.

[2] The *animus furandi* must accompany the taking, but considerable confusion seems to have arisen as to just what is meant by that term. It would appear to be a sound proposition that in cases of common law larceny, as distin-

guished from cases of embezzlement and obtaining property by false pretense, the wrongful taking of the property in question under the circumstances indicated in any of the definitions which we have quoted necessarily and in itself imports the *animus furandi;* and in such cases it would be a contradiction to instruct the jury that such a taking would not be larceny if the accused did not intend to steal. That kind of taking is stealing *per se.* Mr. Wharton says, volume 2, section 1120: "This fraudulent or felonious intent (and the terms are often used convertibly) is an intent without an honest claim of right and with the expectation of benefit to self, to destroy or *take permanently from another goods which are his."*

[3] Another apparent misconception which has entered into some text book discussions and judicial decisions upon this question arises in the application of the correct general proposition that if the goods in question have been taken under a *bona fide* claim of right, there has been no larceny. The seeming misconception suggested here has, as we think, arisen from a failure to observe that there must be a claim of *right and title to the particular goods themselves,* and not some imaginary idea on the part of the taker that he can do what the law says is larceny without committing a crime. There appears to be a paucity of authority upon this precise question, but the following bear more or less directly upon it: 2 Whart. Crim. Law, sec. 1121, p. 1346; 18 Am. & Eng. Encyc. Law, 2nd Ed. p. 524; *State* v. *Williams,* 95 Mo. 247, 8 S. W. 217, 6 Am. St. Rep. 46; *Lancaster* v. *State,* 3 Cold. (Tenn.) 339, 91 Am. Dec. 288; *State* v. *Williams,* 68 W. Va. 86, 69 S. E. 474, 32 L. R. A. (N. S.) 420 (principal case and note thereto) ; *Fanin* v. *State,* 51 Tex. Cr. R. 41, 100 S. W. 916, 10 L. R. A. (N. S.) 744, 123 Am. St. Rep. 874 (principal case and note thereto) ; 25 Cyc. 47 and notes; 17 R. C. L. p. 24, sec. 27 and notes; Note Ann. Cas. 1916C, 71-73; *Webb v. Commonwealth,* 122 Va. 899, 94 S. E. 773.

[4] In this case, however, there was sufficient evidence to make it proper for the trial court to do what in effect and substance it did and submit to the jury the question whether Lytton did in fact take the check under conditions which rendered him guilty of larceny. It may be conceded for the purposes of this case that all of the elements of the offense except one are indisputably established by the evidence, and that one element is the intent to deprive the Lytton Manufacturing Corporation permanently of its property. As already pointed out, Lytton, although indicating a contrary purpose in his letters, did not use any of this money. He put the entire proceeds of the check to his own credit, but to be held until it was determined that he had the right to the proceeds; and he held the fund intact for this purpose until he had actually made a settlement with the company in which he was allowed to keep the money. Under these circumstances we cannot say that the jury was not justified in finding that although he had done an unauthorized act in taking the check from the mails, he did not do it in such way as to convict him of larceny. In this view of the case, the authorities are practically harmonious in holding that the question of intent was one for the jury to decide; and it follows that the court did not err in refusing to set aside the verdict on the alleged ground that the plea of justification was established as a matter of law.

[5] It is contended in the second place that the verdict should have been set aside because the occasion upon which the communication was sent was privileged, and that the privilege was not abused.

We have no difficulty in holding the occasion was privileged; and the trial court properly so informed the jury in the following instruction given at the defendant's request: "The court instructs the jury that the letter written by defendant to Riverside Cotton Mills, set out in the declaration, was a privileged communication, for the protection of his

interests and the interests of the Lytton Manufacturing Company, and as such the defendant is not liable in this action, and whether the statements contained therein are true or not, if the jury believe from the evidence that C. C. Vaughan acted in good faith in writing and sending said letter, without malice to the plaintiff and for the purpose of protecting his interest or the interests of the Lytton Manufacturing Company, believing the language of said letter to be true, then they must find for the defendant in this action, unless they shall believe from the evidence that the language of said letter was not justified by the occasion so as to amount to an abuse of the defendant's privilege in writing said letter to the Riverside Cotton Mills."

[6, 7] We are further of opinion, however, that there was evidence upon which the jury might properly have found that the privilege was abused. The language itself, italicized by the defendant, taken in connection with the previous correspondence and dispute between the parties warranted the court in upholding the action of the jury upon the question of malice. The cases of *Strode* v. *Clement*, 90 Va. 553, 19 S. E. 177, and *Brown* v. *N. & W. Ry. Co.*, 100 Va. 619, 42 S. E. 664, 60 L. R. A. 472, relied upon by counsel for defendant are not in conflict with this conclusion, but, upon the contrary, both of these cases recognize the rule that where there is room to doubt whether the language used is out of proportion to the occasion, or where there is extrinsic evidence of malice such as a previous grudge or quarrel, the jury must be permitted to pass upon the question.

Coming now to the assignments based upon the instructions we find no error therein.

[8] Instruction "C" asked for by defendant was as follows: "The court instructs the jury that if they believe from the evidence in this case that the alleged libelous statements contained in the letter from defendant to Dan River

Cotton Mills were substantially true, they must find for the defendant in this action." The court refused to give this instruction as offered, but amended the same by inserting after the words "substantially true" the words "in the ordinary and usually accepted meaning thereof." Complaint is made of this amendment. The court, however, had already given at the request of the defendant an instruction telling the jury that they were to deal with the words in question in "their usual meaning and ordinary signification." We do not think there was any error in the amendment to the instruction, but if there were the defendant could not be heard to complain of it.

[9] The defendant requested the court to give the following instruction: "The court instructs the jury that an officer and stockholder of a corporation has no right to withdraw from the mail and personally endorse a check, drawn by a debtor of and payable to the corporation, and use, hold or apply the proceeds of said check to the payment of a disputed claim which the officer and stockholder holds or makes against the corporation, without express authority from the corporation or its board of directors, and such action, if without authority, is a misappropriation of the funds of the corporation, whether done with evil intent or not." But the court refused to give the same as offered, and amended it by striking out the words "and such action, if without authority, is a misappropriation of the funds of the corporation whether done with evil intent or not." There was no error in making this alteration. If the language stricken out was intended by the defendant to mean that the taking of the check from the mail was such a wrongful act as to constitute a misappropriation in a felonious sense, then it was improper because it took from the jury the question we have heretofore in the course of this opinion held was within their province. If, on the other hand, the language was not intended to tell the jury

that misappropriation under these circumstances would be a felony, it was mere repetition and meant no more than the instruction imported without it.

[10] It is contended that the court erred in giving on behalf of the plaintiff instruction 2-a as follows: "The court instructs the jury that even should they believe from the evidence that the defendant's communication, dated April 19, 1917, was written and published in good faith, still it is not privileged, and the defendant will not be protected, if they believe from the evidence that it goes beyond the occasion or exigency, and is unnecessarily defamatory of the plaintiff."

The first objection urged against this instruction is that although the court told the jury by another instruction that the letter was privileged, this instruction was in conflict therewith, and told them it was not privileged. We do not so understand the instruction, and think it quite manifest that the jury could not have so understood it. It merely told the jury that the communication would not be privileged if they believed from the evidence that it went beyond the occasion and was unnecessarily defamatory of the plaintiff. This, as we have already seen, is a correct statement of the law.

The remaining objections to the instructions have already been by necessary implication disposed of in the previous part of this opinion, or else are of such minor importance as to require no further discussion.

Upon the whole case we are of opinion that the judgment complained of must be affirmed.

*Affirmed.*